ZIONS FIRST NATIONAL BANK, a corporation, Plaintiff and Respondent,

v.

FIRST SECURITY BANK OF UTAH, N.A., a corporation, Defendant and Appellant,

v.

Don ALLEN, dba Mount Nebo Cattle Company, Intervenor, Respondent and Cross-Appellant,

v.

J. B. J. FEEDYARDS, INC., a corporation, et al., Involuntary Defendants.

No. 13725.

Supreme Court of Utah.

April 15, 1975.

Don B. Allen, Ray, Quinney & Nebeker, Salt Lake City, V. Pershing Nelson, Provo, for defendant and appellant.

Dave McMullin, Payson, for Zions Bank.

Thomas S. Taylor, Provo, for Don Allen.

TUCKETT, Justice:

The plaintiff initiated these proceedings, seeking to recover certain cattle, or their value, which it claims were converted by the defendant, First Security Bank. During the course of the proceedings, Don Allen, dba Mount Nebo Cattle Company, intervened claiming that he was the owner of the cattle. J.B.J. Feedyards, Inc., a corporation, together with Joseph Ford & Sons, a partnership; James K. Ford, William Ford and William G. Boswell were joined as involuntary defendants. After a trial was had, the district court entered judgment adverse to the defendant, First Security Bank, and that defendant has brought the matter here on appeal.

During April of 1972, James K. Ford, William Ford and William G. Boswell organized a corporation known as J.B.J. Feedyards, Inc., and commenced a business of buying and selling cattle as well as the feeding and fattening of the same. To supply capital for the enterprise in addition to that supplied by the incorporators, the corporation borrowed money from the Payson Branch of First Security Bank. The Bank made an initial advancement of the sum of $126,200 on April 20, 1972, and an advance of $39,000 on June 7, 1972, and a final advancement in the sum of $53,000 was made to the corporation on July 12, 1972. The initial loan contemplated the purchase of approximately 600 head of cattle, and to secure the loan J.B.J., together with the Fords and Boswell, entered into a security agreement with First Security Bank covering all of the cattle, together with substitutions, replacements, additions and proceeds thereof. The security agreement also included other real and personal property. Financing statements were filed with the Secretary of State.

J.B.J. purchased a considerable number of cattle from the intervenor, Don Allen, who was engaged in the cattle business in the state of Montana. It was the practice for the intervenor to ship the cattle directly to J.B.J.'s feedyards in Goshen, Utah, or to consignees designated by J.B.J. The shipments of cattle were paid for by J.B.J. on receipt by checks or drafts. During the fall of 1972, the bank accounts of J.B.J. were overdrawn, and First Security became apprehensive about the loans made to J.B.J. In December, First Security ceased making further advancements to J.B.J., and as a result checks and drafts issued by J.B.J. for the purchase of cattle and supplies were dishonored.

During the month of December 1972, the intervenor made two shipments of cattle to J.B.J., but upon learning that J.B.J. could not pay for the cattle, he instructed Boswell, who was in charge of J.B.J.'s operations, to brand the cattle with a different brand and to segregate them from the cattle owned by J.B.J. Boswell had the cattle branded·V5 on the right ribs, which brand was later registered in the name of the intervenor. In early January 1973, the intervenor and his wife came to Utah where they established the Mount Nebo Cattle Company. The Mount Nebo Cattle Company obtained a loan from plaintiff, Zions First National Bank, and entered into a security agreement with the Bank covering 200 head of cattle to secure the loan. Zions filed its financing statement together with the security agreement with the Secretary of State on January 29, 1973. At that time the intervenor named Boswell as his agent to receive and to care for the cattle shipped to Utah on account of the Mount Nebo Cattle Company. The cattle shipped were branded with a V5 brand.

On February 8, 1973, the First Security Bank, in a separate proceeding, attached the cattle belonging to J.B.J. as well as the animals marked with a V5 brand whose ownership is claimed by the intervenor. Among those attached, some were branded with a V5 brand, some were branded with a Montana brand, and some had no brands.

In order to minimize the cost of feeding and caring for the attached animals and to take advantage of a favorable market, it was agreed among the parties that the cattle be sold and the proceeds from the sales be held in a special account to await the determination by the court of the ownership of the cattle.

The court found that of the cattle attached by First Security Bank the intervenor, Don Allen, was the owner of 272 animals, and that he was entitled to the proceeds from the sales thereof subject to the financing agreement with Zions in the sum of $50,000 plus interest. The court further found that First Security Bank was entitled to an offset in the sum of $12,873.79 for the costs of feeding and caring of the intervenor's animals as provided for by the stipulation of the parties.

█ It is the contention of First Security Bank here that the animals in question when delivered by the intervenor to J.B.J. became subject to the financing agreement between First Security and J.B.J. under its terms pertaining to after-aquired property.[1] The difficulty with that contention is that the court found that J.B.J. received the animals in question under an agreement that title would pass only upon payment. It is quite clear that First Security could claim no security interest in the cattle which remained in the ownership of the intervenor. The record supports the trial court's findings that the cattle in question were received by Boswell as agent for the intervenor and that the cattle were branded with a brand later registered in the name of the intervenor.

█ In essense the appeal in this case raises questions of fact rather than issues of law. Our review in such cases goes only to the problem of whether the findings of the trial court are supported by substantial evidence. This court will not upset the findings of a trial court unless the evidence clearly preponderates to the contrary.[2] In this matter, after a careful review of the evidence, we conclude that the findings of the court below are supported by substantial evidence. The finding of the court that the ownership of the animals in question did not pass to J.B.J., but remained in the intervenor, is correct.

The intervenor cross-appeals claiming that the offset awarded to First Security for the cost of feeding the animals while held under the attachment was error inasmuch as the attachment was quashed as being void. The trial court based its determination upon the stipulation entered into by the parties, and we are of the opinion that that determination was correct.

The judgment of the trial court is affirmed. The plaintiff and intervenor, Don Allen, are entitled to costs.

HENRIOD, C. J., and ELLETT, CROCKETT and MAUGHAN, JJ., concur.

1. Sec. 70A–9–204, U.C.A.1953.

2. Nuhn v. Broadbent, 29 Utah 2d 198, 507 P.2d 371; Olsen v. Park Daughters Inv. Co., 29 Utah 2d 421, 511 P.2d 145; Howarth v. Ostergaard, 30 Utah 2d 183, 515 P.2d 442.